CORRECTED
T.C. Memo. 2021-135


UNITED STATES TAX COURT


FAB HOLDINGS, LLC, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

FRANK BERRITTO AND ESTATE OF DANA BERRITTO, DECEASED,
FRANK BERRITTO, EXECUTOR, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 21971-17, 22152-17.                    Filed November 30, 2021.


Kevan P. McLaughlin, for petitioners.

Jeffrey L. Heinkel, Heather K. McCluskey, and Min Young Chan,

for respondent.


MEMORANDUM OPINION


COPELAND, Judge:  The cases before the Court are consolidated for

purposes of briefing and opinion.  The cases were submitted to the Court fully


**Served 01/27/22**

[*2] stipulated pursuant to Rule 122.[1]  The Internal Revenue Service (IRS)

determined deficiencies and penalties for FAB Holdings, LLC (FAB), as follows:

| Tax year ending 3/31 | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2010 | $23,574 | $4,715 |
| 2011 | 8,490 | 1,698 |
| 2012 | 34,090 | 6,818 |
| 2013 | 19,276 | 3,855 |

The IRS determined deficiencies and penalties for Frank Berritto and Dana

Berritto, Deceased, as follows:

| Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2010 | $64,102 | $12,820 |
| 2011 | 78,044 | 15,601 |
| 2012 | 113,389 | 22,678 |
| 2013 | 81,620 | 16,324 |

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

**[\*3]** After concessions,[2] the issues for decision are: (1) whether the statutory notices of deficiency (SNODs) were timely sent,[3] (2) whether there should be a correlative adjustment[4] to the gross income of FAB, and (3) whether petitioner Frank Berritto received constructive dividends from FAB in tax years 2010, 2011, and 2012 and petitioners Frank Berritto and the Estate of Dana Berritto received constructive dividends from FAB in 2013.

## Background

These cases were submitted in accordance with Rule 122. The stipulated facts are found accordingly. When the petitions were timely filed in these consolidated cases, Frank Berritto resided in New York, the Estate of Dana Berritto was administered in New York, and FAB's principal place of business was in New York.[5]

---

[2]Respondent conceded the sec. 6662(a) penalties. Respondent also conceded that the assessment limitations periods expired with respect to the Estate of Dana Berritto for tax years 2010, 2011, and 2012.

[3]The Berrittos' 2013 tax year is excluded from this issue.

[4]While petitioners use the term "correlative adjustment", they are asking for consistency and a corresponding adjustment, and as discussed infra note 23, sec. 482 does not apply in this situation.

[5]These cases are therefore appealable to the U.S. Court of Appeals for the Second Circuit unless the parties stipulate otherwise. See sec. 7482(b)(1) and (2).

**[*4]** I.     The Berrittos

The Berrittos were married during the years at issue. However, Mrs. Berritto passed away on March 6, 2015. Mr. Berritto worked in the financial industry. In 2010 Mr. Berritto started working for Merrill Lynch, Pierce, Fenner & Smith, Inc., and he worked there for the remaining years at issue.

II.     Mr. Arias and the Integrated Tax Plan

In late 2009 or early 2010 the Berrittos decided to hire A.V. Arias & Co. to prepare an integrated tax plan (ITP). The ITP included the formation of two entities: a C corporation (FAB) and a partnership (Berritto Enterprises, LLC (Enterprises)). FAB was organized and Enterprises was formed in Delaware on November 30, 2010. The Berrittos were the sole owners of FAB and the sole partners of Enterprises, each owning a 50% interest in each entity. During the years at issue Mr. Berritto was the managing member of Enterprises and the president of FAB.

Mr. Berritto was involved in the structuring of the ITP (for example by emailing his choice of entity names and noting that he would contribute securities as the initial capital for Enterprises); he was involved thereafter in administering the entities' transactions. During the years at issue Mr. Berritto worked

[*5] approximately 600 hours per year for FAB while Mrs. Berritto worked approximately 40 hours per year for both FAB and Enterprises.

Enterprises filed a Form 1065, U.S. Return of Partnership Income, as its initial return and for each tax year at issue.[6]  In contrast FAB filed a Form 1120, U.S. Corporation Income Tax Return, as its initial return and for each tax year at issue.  To its initial return FAB attached a Form 8832, Entity Classification Election, choosing to be classified as an association taxable as a corporation.

On December 1, 2010, FAB and Enterprises entered into a "Management Agreement."  Mr. Berritto signed the agreement on behalf of both entities as president of FAB and managing member of Enterprises.

Enterprises' income was largely interest, dividends, and capital gains from securities investments contributed by the Berrittos.  FAB's income was mostly, if not solely, payments from Enterprises.  Per their "Management Agreement"

---

[6]The check-the-box regulations found in secs. 301.7701-1 through 301.7701-3, Proced. & Admin. Regs., provide the rules for the classification of business entities for Federal tax purposes. Comensoli v. Commissioner, T.C. Memo. 2009-242, 98 T.C.M. (CCH) 362, 363 (2009), aff'd, 422 F. App'x 412 (6th Cir. 2011).  Under the check-the-box regulations, a business entity, such as a limited liability company, with two or more members can be classified as either a partnership or a corporation. Id.  A new domestic unincorporated entity, other than a single-owner entity, is a partnership for tax purposes unless the entity makes an affirmative election to be an association taxed as a corporation. Sec. 301.7701-3(a) and (b)(1)(i), Proced. & Admin. Regs.  Because no election was made, Enterprises' default classification was partnership.

**[*6]** Enterprises paid FAB management fees and deducted those fees each year. This created nonpassive losses which flowed through the partnership and were reported on the Berrittos' individual returns. FAB conversely reported the fees as income.

III. Yearly Tax Returns

Mr. Berritto hired Mr. Arias to prepare and file the Berrittos' joint individual returns, Enterprises' Forms 1065, and FAB's Forms 1120 for the years at issue. The Berrittos paid Mr. Arias over $20,000 for his services. Mr. Berritto reviewed and approved the returns before signing them, and the returns were timely filed. Throughout the years at issue Enterprises would pay fees, such as management fees or bonuses, to FAB. However, because FAB had a March 31 yearend and Enterprises had a calendar yearend there were timing differences between when Enterprises reported the expenses and when FAB picked up the corresponding items as income.

A. 2010 Returns

For 2010 Enterprises reported $193,497 of tax-exempt interest income and $264 of dividend income; it deducted $143,079 of management fees[7] and $21,000 of rent expense. It reported an ordinary business loss of $164,079.

_____

[7]For all years at issue the management fees were paid to FAB.

[*7]   For the year ending March 31, 2011, FAB reported $169,145 of income. Most of FAB's income consisted of management fees from Enterprises.[8]  FAB deducted expense totaling $129,152, including the following items:  $34,305 of salaries and wages, $30,000 of officer compensation, and $12,500 of legal and professional fees.

For 2010, among other items not in dispute, the Berrittos reported $1,284 of wage income from FAB and deducted the $164,079 flowthrough loss from Enterprises.

B.   2011 Returns

For 2011 Enterprises reported $2,869 of interest income, $173,863 of tax-exempt interest income, $103,591 of dividend income, and $59,794 of net long-term capital gain.  Enterprises deducted $21,000 of rent expense, $366 of interest expense, and a total of $209,647 of other deductions.  The other deductions consisted of $5,049 of amortization expense, $15,610 of accounting fees, $10,000 for a business plan, and $178,988 of management fees.  Enterprises reported an ordinary business loss of $231,013.

---

[8]For the years at issue FAB's reported income differs from Enterprises' reported management fee expense because of timing differences.  As noted supra p. 6, FAB has a March 31 yearend and Enterprises has a calendar yearend.

[*8]   For the year ending March 31, 2012, FAB reported income of $169,955, most of which was from Enterprises.  FAB deducted expenses totaling $142,366, including $8,491 of legal and professional fees.

For 2011, among other items not in dispute, the Berrittos reported $31,021[9] of wage income from FAB and deducted the $231,013 flowthrough loss from Enterprises.

C.   2012 Returns

For 2012 Enterprises reported $7,034 of interest income, $70,184 of tax-exempt interest income, $218,234 of dividend income, and $144,229 of net long-term capital gain.  Enterprises deducted $21,000 of rent expense, $85 of interest expense, and $252,131 of other deductions.  The other deductions consisted of $1,360 of accounting fees, $504 of legal and professional fees, $250 of office expense, $52,664 of management fees, and $197,353 for a performance bonus.[10] Enterprises reported an ordinary business loss of $273,216.  Enterprises also filed a 2012 Form 1065X, Amended Return or Administrative Adjustment Request

---

[9]This amount includes $30,000 of uncontested officer compensation that, because of FAB's having a March 31 yearend, relates to FAB's reporting on an earlier filed return.

[10]Like the management fees, any performance bonuses were paid to FAB during the years at issue.

**[*9]** (AAR), on May 24, 2014. That amended return did not change any of the items in dispute.

For the year ending March 31, 2013, FAB reported $257,683 in income. Most of FAB's income was from Enterprises. Of the income reported, $197,354[11] was for other income, which was further detailed as a performance bonus. FAB deducted expenses totaling $277,840, including the following items: $8,440 of legal and professional fees, $118,813 of employee benefit plan expense (further detailed as $30,982 of medical reimbursements and $87,831 of long-term care insurance), and $14,000 of director's fees.

For 2012, among other items not in dispute, the Berrittos reported the $14,000 of director's fee income from FAB and deducted the $273,216 flowthrough loss from Enterprises.

D.    2013 Returns

For 2013 Enterprises reported $12,536 of ordinary income from other partnerships, estates, and trusts, $30,647 of interest income, $56,653 of tax-exempt interest income, and $329,814 of dividend income. Enterprises deducted $21,000 of rent expense, $21,642 for taxes and licenses, $207 of depreciation, and

---

[11]We note that there was a rounding difference between FAB and Enterprises.

[*10] $198,025 of other deductions. The other deductions consisted of $195 of amortization, $16,875 of accounting fees, $62,412 of management fees, and $118,543 for a performance bonus. Enterprises reported a loss of $250,215 comprising an ordinary business loss of $228,338 and a net rental real estate loss of $21,877.

For the year ending March 31, 2014, among other items, FAB reported total income of $181,655.[12] Most of this income was from Enterprises. FAB deducted expenses totaling $151,407, including the following items: $11,436 of legal and professional fees, $40,088 of employee benefit plan expense, $14,000 of director's fees, and $6,352 of taxes and licenses.

For 2013 among other items not in dispute, the Berrittos reported the $14,000 of director's fee income from FAB and deducted a $250,215 flowthrough loss from Enterprises.

IV.    Authorizations and Consents for the Berrittos

In March 2014 Mr. and Mrs. Berritto each signed a Form 2848, Power of Attorney and Declaration of Representative, authorizing Mr. Arias to sign consents to extend the assessment limitations periods on their behalf for the

---

[12]This is approximately the $62,412 management fee and the $118,543 performance bonus Enterprises claimed as a deduction.

[*11] 2010-17 tax years.  On April 7, 2014, respondent received the fully executed

Forms 2848 for Mr. and Mrs. Berritto.  On August 2, 2017, Mr. Berritto signed a

Form 2848 as executor of Mrs. Berritto's estate, authorizing Mr. Arias to sign

consents to extend the assessment limitations periods on the estate's behalf for the

2010-17 tax years.  Also on August 2, 2017, Mr. Berritto signed a Form 56, Notice

Concerning Fiduciary Relationship, on which he stated he was the executor of

Mrs. Berritto's estate.  On August 7, 2017, respondent received the Form 2848 for

Mrs. Berritto's estate and the fiduciary notice.

Mr. Arias signed four Forms 872, Consent to Extend the Time to Assess

Tax, purporting to extend the time for the IRS to assess Mr. Berritto's tax for

2010, 2011, and 2012 tax years to August 8, 2018.[13]

---

[13]On April 16, 2014, Mr. Arias signed a Form 872 on behalf of Mr. and Mrs. Berritto.  This extended the time to assess tax for the 2010 return to October 15, 2015.  On May 28, 2015, after Mrs. Berritto passed away, Mr. Arias signed a second Form 872 on behalf of the Berrittos.  But because of the intervening death, this extended the time to assess tax for only Mr. Berritto's 2010 and 2011 returns to October 30, 2016.  On March 11, 2016, Mr. Arias signed a third Form 872 on behalf of the Berrittos.  This extended the time to assess tax for only Mr. Berritto's 2010, 2011, and 2012 returns to August 4, 2017.  On December 12, 2016, Mr. Arias signed a fourth Form 872 on behalf of the Berrittos.  This extended the time to assess tax for only Mr. Berritto's 2010, 2011, 2012, and 2013 returns to August 8, 2018.  As discussed infra note 16 the 2013 SNOD was issued within the assessment limitations period as to both Mr. Berritto and the Estate of Dana Berritto.  However, as we noted supra note 2, respondent conceded that the assessment limitations periods expired with respect to the Estate of Dana Berritto

(continued...)

**[\*12]** V.     Authorizations and Consents for FAB

On June 12, 2014, Mr. Berritto signed, as president of FAB, a Form 2848 authorizing Mr. Arias to sign consents to extend the assessment limitations periods on behalf of FAB for tax years ending March 31, 2010 through 2017.  Ultimately, four Forms 872 were executed for FAB, which extended the time to assess tax on FAB's Forms 1120 to August 8, 2018, for the tax years ending March 31, 2011 through 2014.  The following table illustrates the four consents executed on behalf of FAB and the extension dates as well as the date the SNOD was issued to FAB.

| Year ending | Return filing date | 3-yr. assess. limit. pd. exp. date | First consent received 6/21/14 extends to... | Second consent received 2/12/15 extends to... | Third consent received 3/15/16 extends to... | Fourth consent received 11/15/16 extends to... | SNOD issue date |
|---|---|---|---|---|---|---|---|
| 3/31/11 | 8/5/11 | 8/5/14 | 10/15/15 | 10/30/16 | 8/4/17 | 8/8/18 | 7/26/17 |
| 3/31/12 | 8/1/12 | 8/1/15 | --- | 10/30/16 | 8/4/17 | 8/8/18 | 7/26/17 |
| 3/31/13 | 11/8/13 | 11/8/16 | --- | --- | 8/4/17 | 8/8/18 | 7/26/17 |
| 3/31/14 | [1]6/15/14 | 6/15/17 | --- | --- | 8/4/17 | 8/8/18 | 7/26/17 |

[1]The return was filed before the June 15, 2014, due date.  However, for the calculation of the assessment limitations period, the assessment period begins the later of the filing date or the due date.  See sec. 6501(b)(1).

---

[13](...continued)
for tax years 2010, 2011, and 2012.

**[\*13]** Mr. Berritto personally signed the first Form 872 as president of FAB.  Mr. Arias signed the last three Forms 872 as FAB's representative.

VI.     Statutory Notices of Deficiency

On July 26, 2017, the IRS mailed the SNODs for the Berrittos' individual returns for tax years 2010 through 2013 and FAB's returns for tax years ending March 31, 2011 through 2014.  The adjustments in the SNODs consisted of three main categories:  (1) adjustments to Enterprises' and FAB's expense deductions; (2) constructive dividends to the Berrittos from FAB; and (3) penalties.

A.      The Berrittos' SNOD

Of the adjustments made to flowthrough items from Enterprises, the SNOD issued to the Berrittos disallowed the deductions for management fees and performance bonuses paid to FAB.  Those adjustments resulted in passthrough adjustments to the Berrittos' individual returns.

In the "Explanation of Items" related to "Sch E-Inc/Loss-Partnership Berritto Enterprises" the examining agent stated in error[14] that "[w]e adjusted your return in accordance with the examination results of the S corporation return

---

[14]We asked the Berrittos and respondent to clarify the use of the term S corporation to describe Enterprises, and both parties agreed it was in error.

[*14] (Form 1120S) of which you are a shareholder." Enterprises was taxed as a partnership, not an S corporation. Enterprises filed Forms 1065, not Forms 1120S.

In the "Explanation of Items" for "Ordinary Dividends FAB Holding LLC" the examining agent stated that "[w]e have disallowed the personal expenses of your shareholder(s) paid by the S Corporation and these expenses were classified as [a] constructive dividend to the shareholder(s)." FAB was and still is a C corporation and filed Forms 1120; it was never an S corporation. The constructive dividend adjustments to the Berrittos' returns were $44,500, $8,491, $118,421, and $37,788 for the 2010, 2011, 2012, and 2013 tax years, respectively.

B.    FAB's SNOD

The SNOD issued to FAB determined that certain expense deductions were in fact constructive dividends for the benefit of its shareholders. As a result, the expense deductions were reduced by amounts equal to the constructive dividends. These adjustments to the expense deductions are more fully set forth below:

| [*15]<br>Expense adjustments | Tax year<br>ending<br>3/31/2011 | Tax year<br>ending<br>3/31/2012 | Tax year<br>ending<br>3/31/2013 | Tax year<br>ending<br>3/31/2014 |
|---|---|---|---|---|
| Salaries and wages | $32,000 | --- | --- | --- |
| Legal and professional services | 12,500 | $8,491 | $8,440 | $3,430 |
| Employee benefit programs | --- | --- | 95,981 | 17,256 |
| Director's fees | --- | --- | 14,000 | 14,000 |
| Taxes and licenses | --- | --- | --- | 3,102 |
| Total | 44,500 | 8,491 | 118,421 | 37,788 |

FAB's SNOD did not make any adjustments to FAB's income for the relevant tax years or to the remaining expense deductions for each year.

The Berrittos and FAB timely petitioned the Court.

## Discussion[15]

I.       Statute of Limitations

Petitioners contend that the assessment limitations periods expired before the SNODs were sent to them.[16] More specifically, petitioners argue that Mr.

---

[15]While the SNODs, the petitions in these cases, and much of respondent's briefing referred to Enterprises as an S corporation, the record clearly reflects that Enterprises was a partnership at all times.

[16]Petitioners make this argument as to all years except for the Berrittos' 2013 tax year. The SNOD for 2013 was sent before the expiration of the three-year limitations period and no extension was required. In addition as noted supra note 2 respondent conceded the assessment limitations periods expired as to the Estate of Dana Berritto for tax years 2010, 2011, and 2012.

**[\*16]** Arias was operating with such an inherent conflict of interest that the Forms 872 he signed were not valid, and therefore, the extensions of the limitations periods expired before the SNODs' being issued.

Ordinarily, the Commissioner must assess a tax within three years after a return is filed. See sec. 6501(a). This period for assessment may be extended if the Commissioner and the taxpayer have consented in writing to an extension, provided that their agreement is executed before the expiration of the otherwise applicable limitations period.[17] Sec. 6501(c)(4)(A).

A.    Burden of Proof

The expiration of the assessment limitations period is an affirmative defense, and the party raising it must specifically plead it and carry the burden of proving its applicability. Rules 39, 142(a); Mecom v. Commissioner, 101 T.C. 374, 382 (1993), aff'd without published opinion, 40 F.3d 385 (5th Cir. 1994); Heckman v. Commissioner, T.C. Memo. 2014-131, at \*10-\*11, aff'd, 788 F.3d 845 (8th Cir. 2015). To establish this defense, taxpayers must make a prima facie case establishing the date of the filing of their return, the expiration of the assessment limitations period, and receipt or mailing of the SNOD after the

---

[17]The agreement may also be signed by a taxpayer's authorized representative. See Lyon v. Commissioner, T.C. Memo. 1994-351.

[*17] running of the period.  Coleman v. Commissioner, 94 T.C. 82, 89 (1990);

Robinson v. Commissioner, 57 T.C. 735, 737 (1972).  Where taxpayers have

established a prima facie case that the Commissioner mailed the SNOD to them

beyond the three-year period, the burden going forward is on the Commissioner to

prove that an exception to the period of limitations applies.  Jordan v.

Commissioner, 134 T.C. 1, 6 (2010), supplemented by T.C. Memo. 2011-243.  For

example, if the Commissioner can show a facially valid extension, then the burden

shifts back to the taxpayers to show that the consent was ineffective to extend the

limitations period.  Adler v. Commissioner, 85 T.C. 535, 541 (1985); see also

sec. 6501(c)(4).

Petitioners established a prima facie case for the Berrittos' 2010, 2011, and

2012 taxable years and for FAB's tax years ending March 31, 2011 through 2014,

because the SNODs at issue are dated July 26, 2017, more than three years after

the returns for those years were filed.[18]  See Adler v. Commissioner, 85 T.C.

at 540-541.  Accordingly, the burden of going forward with respect to those tax

years shifts to respondent.  In satisfaction of his burden respondent showed the

limitations periods were extended for Mr. Berritto and FAB by presenting multiple

---

[18]As discussed supra note 16, the SNOD as to the Berrittos' 2013 tax year
was sent before the expiration of the assessment limitations period.

[*18] facially valid Forms 872.  Respondent has conceded that the Forms 872 were invalid as to the Estate of Dana Berritto.[19]  As to Mr. Berritto and FAB, each Form 872 was signed by either Mr. Arias or Mr. Berritto before the expiration of the limitations periods, extending the periods to August 8, 2018.  The SNODs were dated July 26, 2017.  Therefore, respondent met his burden to show that the SNODs for the Berrittos' 2010, 2011, and 2012 tax years and for FAB's tax years ending March 31, 2011 through 2014, were mailed within the assessment limitations periods as extended for Mr. Berritto and FAB.[20]

The burden of going forward now shifts to petitioners to prove that the Forms 872 were invalid.

---

[19]"The Code treats married taxpayers who file jointly as one taxable unit; however, it does not convert two spouses into one single taxpayer." Vichich v. Commissioner, 146 T.C. 186, 193 (2016).  Spouses filing a joint return are separate taxpayers, and each spouse has an absolute right to extend or not extend the time within which to assess tax. Dolan v. Commissioner, 44 T.C. 420, 427-428 (1965).  A waiver to extend the time within which to assess tax is valid only as to the spouse who signs the waiver. Tallal v. Commissioner, 77 T.C. 1291, 1295 (1981).  Mrs. Berritto passed away on March 6, 2015.  Therefore, after that date Mr. Arias could no longer sign for her, and the Forms 872 signed thereafter are not valid as to Mrs. Berritto or her estate.

[20]As noted above, petitioners conceded that the SNOD for the 2013 tax year for both Mr. Berritto and the Estate of Dana Berritto was sent before the expiration of the limitations period such that no extension was required.

**[\*19]** B.    <u>Validity of Forms 872</u>

Petitioners assert that the Forms 872 are invalid and therefore did not extend the assessment limitations periods because Mr. Arias had an inherent conflict of interest. According to petitioners, Mr. Arias was a promoter because he advised them to implement the structure at issue and received payment for his advice. Consequently, petitioners contend Mr. Arias' status as a promoter invalidates his authority to act on their behalf. We find this argument unpersuasive.

Petitioners label Mr. Arias a promoter; however, the line of cases petitioners relied on, in which the taxpayers argued they reasonably relied on their tax adviser to avoid penalties, are taken out of context. Petitioners rely on <u>106 Ltd. v. Commissioner</u>, 136 T.C. 67 (2011), <u>aff'd</u>, 684 F.3d 84 (D.C. Cir. 2012), to support their argument that Mr. Arias was a promoter. In <u>106 Ltd.</u> the taxpayer's advisers coordinated the entire transaction and "profited from selling the transaction to numerous clients." <u>Id.</u> at 80-81. The Court in <u>106 Ltd.</u> described a promoter as "an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction." <u>Id.</u> at 79 (quoting <u>Tigers Eye Trading, LLC v. Commissioner</u>, T.C. Memo. 2009-121, 2009 WL 1475159, at \*19). Petitioners argue that Mr. Arias falls within that definition because he

[*20] was involved with the transaction, and therefore he had a conflict of interest. We are not convinced.

In 106 Ltd. v. Commissioner, 136 T.C. at 80, the Court also cautioned that "[o]ne might need to be careful in applying the definition to some kinds of transactions--a tax lawyer asked by a businessman for advice on how to sell the family business through a tax-favored stock redemption might be said to have 'participated in structuring the transaction.'" The mere fact that an adviser is being paid to help with a transaction does not transform the adviser into a promoter. Rather, when the "transaction involved is the same tax shelter offered to numerous parties, the [Tigers Eye Trading, LLC] definition is workable." Id.

Here, Mr. Berritto hired Mr. Arias to structure the ITP to help him and Mrs. Berritto save on their taxes. Mr. Arias did not benefit from or have an interest in the transaction outside of fees generated from time spent setting up the transaction and providing accounting and tax preparation services. Furthermore, while Mr. Arias advised Mr. Berritto on the ITP, Mr. Berritto also participated in planning the structure.[21] Petitioners have offered no evidence to show that Mr. Arias was offering multiple clients the same tax plan. Similar to the "tax lawyer" example in

_____

[21]For example, although Mr. Arias wanted Mr. Berritto to use "Management" in the C corporation's name, Mr. Berritto decided to call the C corporation FAB Holdings, LLC.

**[\*21]** <u>106 Ltd.</u>, as any individual would go to an adviser for help in setting up a transaction, Mr. Berritto went to Mr. Arias for general tax planning advice. Mr. Arias helped the Berrittos with their ITP but was not a promoter with an inherent conflict of interest.

Petitioners cast a wider net arguing that because Mr. Arias was paid to set up the transaction he had an inherent conflict of interest. Petitioners incorrectly draw analysis from <u>Transpac Drilling Venture 1982-12 v. Commissioner</u>, 147 F.3d 221 (2d Cir. 1998), <u>rev'g and remanding</u> T.C. Memo. 1994-26. Petitioners' cases are a far cry from <u>Transpac</u>, where the U.S. Court of Appeals for the Second Circuit found that there was a conflict of interest that prevented the tax matters partners from acting as representatives for the partners of the partnership when the tax matters partners unilaterally signed the extensions of the limitations period. <u>Id.</u> at 227. In that case the IRS was unable to get the consents from the limited partners so it turned to the tax matters partners, who purportedly acted on behalf of the limited partners. <u>Id.</u> at 224. Even more egregious, those tax matters partners were under a criminal investigation and therefore had a significant conflict of interest because of their willingness to oblige the IRS' requests for their own benefit, ignoring their fiduciary duty to the limited partners. <u>Id.</u> at 227-228. Petitioners argue that Mr. Arias' role was like that of the tax matters partners in

[*22] <u>Transpac</u>: Because the IRS knew that Mr. Arias played a role in establishing petitioners' ITP, the IRS was on notice that he had a conflict. This argument is beyond the pale.

Petitioners make several unjustified and extensive leaps to compare these cases with <u>Transpac</u>. Under petitioners' proposed conflict of interest standard, taxpayers who paid a tax preparer or an attorney as their representative could not have the preparer or attorney represent them before the IRS (or in a judicial proceeding) arising out of the transaction for which the preparer or attorney was paid. However, taxpayers often select the firm or person who planned the transaction to be their representative before the IRS in a subsequent inquiry. Petitioners sought Mr. Arias' expertise for tax planning and preparation. Mr. Arias provided tax planning services to the Berrittos but also prepared yearly returns for them, FAB, and Enterprises. Petitioners paid Mr. Arias around $20,000 for these services. Unlike <u>Transpac</u>, these cases reveal no evidence that Mr. Arias was under criminal investigation with a propensity to cooperate with the IRS. The act of charging for services is not a criminal activity. Nothing in the record indicates that Mr. Arias' extending the assessment limitations periods involved an inherent conflict of interest. Furthermore, unlike the limited partners in <u>Transpac</u>, while Mr. Arias signed all of the Forms 872 for the Berrittos'

**[\*23]** individual returns and most of FAB's Forms 872, Mr. Berritto personally signed the first Form 872 for FAB. Consequently, <u>Transpac</u> is not an analogous case.

Similarly, petitioners argue that Circular 230, which governs practice before the IRS, identifies Mr. Arias' conduct as a conflict of interest. <u>See</u> 31 C.F.R. sec. 10.0(a) (2021). Circular 230 notes that there is conflict of interest when "[t]here is a significant risk that the representation of one or more clients will be materially limited by * * * a personal interest of the practitioner." <u>Id.</u> sec. 10.29(a)(2). Petitioners argue that the IRS should have known that there was an inherent conflict of interest in Mr. Arias' signing the extensions because he also signed the tax returns as a paid preparer. As stated above, the suggestion that because an individual is paid or part of a transaction's planning that individual would automatically be unable to represent a taxpayer is not practical. Such a standard would invalidate the representation of taxpayers by numerous attorneys, accountants, and power of attorney holders because those individuals often perform tax planning and tax preparation and subsequently represent their clients before the IRS. There will always be an underlying monetary tug between clients and their paid representatives. Circular 230 is a mechanism to allow sanctions for violating the regulations governing practice before the IRS; it is not a mechanism

**[\*24]** to determine whether a power of attorney is valid and confers authority to sign Forms 872. 31 C.F.R. sec. 10.0(a). Accordingly, petitioners' position has no merit. Consequently, we find that petitioners did not prove there was an inherent conflict of interest.

In conclusion, we hold that the assessment limitations periods were properly extended as to Mr. Berritto for tax years 2010 through 2012 and for FAB for the tax years ending March 31, 2011 through 2014. Accordingly, we conclude that the SNODs at issue in these cases were timely sent to petitioners.

II.     Correlative Adjustment

Generally SNODs are presumed correct, and taxpayers generally bear the burden of proving their determinations erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

The Berrittos' SNOD disallowed the deductions for management fees and performance bonuses claimed by Enterprises for payments to FAB, which in turn decreased the losses flowing through to the Berrittos' returns.[22] Petitioners do not

---

[22]The Berrittos' SNOD also disallowed other deductions claimed by Enterprises that affected the loss that flowed through to the Berrittos' returns, including deductions such as rent, interest, amortization, legal and accounting fee expenses; but petitioners did not ask for a correlative adjustment for those items and otherwise conceded those adjustments. The Berrittos' SNOD also increased the Berrittos' income by asserting constructive dividends from FAB. Those

(continued...)

[*25] dispute these adjustments but rather assert that they require a correlative

adjustments to FAB's income that was not taken into account in the proposed

adjustments outlined in FAB's SNOD. Petitioners argue that respondent is

required to reduce FAB's income in amounts corresponding to the amounts of

Enterprises' disallowed deductions for management fees and performance

bonuses. They contend that without such adjustments to FAB's income they

would be "double taxed," which they believe is unfair. For the reasons discussed

below, respondent is not required to make correlative adjustments[23] to FAB's

income.

Petitioners invite the Court to modify FAB's income by analogizing their

cases to Alondra Indus., Ltd. v. Commissioner, T.C. Memo. 1996-32, 1996 WL

31250, at *19-*20, where correlative adjustments were made to a partnership's

income when three related corporations made payments for management services

to the partnership they owned. In that case adjustments were made because the

corporations' deductions for those services were disallowed and the partnership

---

[22](...continued)
adjustments will be discussed separately. See infra pp. 27-32.

[23]We note that correlative adjustments or allocations typically arise in the context of sec. 482. However, sec. 482 was not argued by the parties and is not at issue in these cases.

**[*26]** was treated as a mere conduit for the transaction. <u>Id.</u> at *20. We find <u>Alondra</u> distinguishable. In these cases we find significant that the payments were made from a partnership (Enterprises) to a separate C corporation (FAB) that was not directly owned. There was no direct flowthrough impact as in <u>Alondra</u>. In addition the recipient entity was deemed a mere conduit in <u>Alondra</u>. Here the recipient entity is a C corporation that had significant other transactions that affected third parties[24] such that it was not a mere conduit for the income.[25]

The tax consequences of operating a business through a C corporation are different from those of a partnership. Pursuant to sections 701 and 702, partnerships are flowthrough entities, which means that they do not pay tax at the partnership level. <u>See</u> <u>United States v. Basye</u>, 410 U.S. 441, 448 (1973). A corporation, on the other hand, is a separate taxable entity from its shareholders. <u>Moline Props. v. Commissioner</u>, 319 U.S. 436, 439 (1943). Consequently, when it is operating as a C corporation, the income is taxed first at the corporate level. <u>See</u> sec. 61. And then, upon a distribution from the corporation to the shareholders,

---

[24]One such transaction was a funded profit-sharing plan that benefited the Berrittos.

[25]Respondent also misapplies <u>Alondra Indus., Ltd. v. Commissioner</u>, T.C. Memo. 1996-32. Respondent argues that Enterprises is an "S corporation," and that therefore <u>Alondra</u> should not apply. Enterprises is a partnership. Regardless of respondent's mischaracterization, as outlined above, <u>Alondra</u> is not analogous.

**[\*27]** the shareholders also have tax consequences. <u>See</u> <u>id.</u> In structuring their business as a separate taxable entity, shareholders consider whether "there was some benefit in doing business through a corporation. They must accept the liabilities as well as the benefits." <u>Noble v. Commissioner</u>, 368 F.2d 439, 445 (9th Cir. 1966), <u>aff'g</u> T.C. Memo. 1965-84. "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not." <u>Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.</u>, 417 U.S. 134, 149 (1974).

The Berrittos chose to make FAB a C corporation and themselves shareholders of it. FAB received payments from Enterprises, which are taxable to FAB. <u>See</u> sec. 61(a)(1). Petitioners have not provided any cogent legal argument, other than citing <u>Alondra</u>, that would allow such payments to be nontaxable. Likewise, this Court has not found any precedent indicating that respondent is required to oblige their request. Because FAB has not proven its entitlement to a reduction in income, respondent is not required to reduce FAB's income.

III.  <u>Constructive Dividends</u>

The Berrittos' SNOD likewise proposed adjustments to their income in the form of constructive dividends. Petitioners argue that there were no constructive dividends because double taxation would result and that respondent did not meet

[*28] his burden of proof regarding constructive dividends.[26] For the reasons discussed below we disagree with petitioners except to the extent of the constructive dividends related to director's fees. Generally, a SNOD is entitled to a presumption of correctness. Rule 142(a); Welch v. Helvering, 290 U.S. at 115 (1933). In determining whether the Court should sustain the constructive dividend determination, we look to the U.S. Court of Appeals for the Second Circuit to which an appeal in these cases would lie absent a stipulation to the contrary. See sec. 7482(b)(1) and (2); Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). That Court of Appeals has held that the Commissioner bears the initial burden of proof and that he must establish a reasonable connection between the taxpayer and the income-producing activity.

---

[26]Throughout these cases respondent has, at times, not fully paid attention to details. In his seriatim answering brief, respondent argues that petitioners "have waived this issue by (1) not raising it in the pretrial memo, and (2) not including it (except perhaps as an afterthought) in the issues presented portion of their opening brief." Respondent appears to have forgotten the multiple times petitioners have addressed this issue. In the Berrittos' petition they argue that FAB did not pay or incur personal expenses on their behalf that would create a constructive dividend in 2010, 2011, 2012, or 2013. Furthermore, while petitioners do not specifically use the phrase "constructive dividend" in their pretrial memo, in the very first issue petitioners ask whether they are "liable for additional 'qualified dividends' by virtue of * * * [Mr. Berritto's] relationship to FAB Holdings, LLC, or should items on that return be adjusted." While it would have been more appropriate to separate the two issues, petitioners did address this issue. So, while respondent does not acknowledge all of the issues raised by petitioners, they were indeed raised.

[*29] <u>See, e.g.</u>, <u>Llorente v. Commissioner</u>, 649 F.2d 152, 156 (2d Cir. 1981) (citing <u>Weimerskirch v. Commissioner</u>, 596 F.2d 358 (9th Cir. 1979), <u>rev'g</u> 67 T.C. 672 (1977)), <u>aff'g in part, rev'g in part</u> 74 T.C. 260 (1980). The Commissioner must establish some evidentiary foundation linking the taxpayer to the tax generating acts. <u>Id.</u>

In these cases respondent has met his burden of proof. Here the constructive dividends at issue stemmed from the recharacterization of FAB's deductions for salary, legal and professional fees, medical reimbursements, long-term care insurance, employee benefits programs, director's fees, and taxes and licenses as dividends. These "deductions" were recharacterized because FAB paid the Berrittos' personal expenses. The Berrittos were clearly involved in the transactions as evidenced by: (1) Mr. Berritto's emails and his position as president of FAB; (2) Mr. and Mrs. Berritto's 50% ownership of FAB; and (3) the manner in which income and expenses were reported on the returns for the Berrittos and FAB. Accordingly, respondent has met his burden of showing that there is a reasonable connection between the Berrittos and the constructive dividends, as there is evidence linking the Berrittos to the tax generating acts.

As respondent has met his initial burden, the burden shifts to petitioners to prove that his determinations are erroneous or arbitrary. <u>See</u> <u>Helvering v. Taylor</u>,

**[\*30]** 293 U.S. 507, 514-515 (1935); see also Texasgulf, Inc., & Subs. v. Commissioner, 172 F.3d 209, 214 (2d Cir. 1999), aff'g 107 T.C. 51 (1996).

Dividends may be formally declared or constructive. A constructive dividend arises "[w]here a corporation confers an economic benefit on a shareholder without the expectation of repayment, * * * even though neither the corporation nor the shareholder intended a dividend." Hood v. Commissioner, 115 T.C. 172, 179 (2000) (quoting Magnon v. Commissioner, 73 T.C. 980, 993-994 (1980)); see also Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987). Sections 301 and 316 govern the characterization of a corporate distribution of property to a shareholder. If the distributing corporation has sufficient earnings and profits, then the distribution is a dividend which is included in the shareholder's gross income. Secs. 301(c)(1), 316. If the distribution exceeds the corporation's earnings and profits, the excess is first a return of capital and any remaining is taxed as capital gain. Sec. 301(c). The taxpayer bears the burden of proving that the corporation lacks sufficient earnings and profits to support dividend treatment. Truesdell v. Commissioner, 89 T.C. at 1295-1296; see also Luczaj & Assocs. v. Commissioner, T.C. Memo. 2017-42, at \*22-\*23.

Petitioners' argument regarding the treatment of the distribution stems from their assertion that FAB is entitled to a correlative adjustment. Reducing FAB's

[*31] income reduces its earnings and profits. If FAB's income is reduced, the Berrittos can recover some of their basis in FAB stock before recognizing gain, thereby reducing their income tax liabilities. See sec. 301(c)(2) and (3). As discussed supra pp. 24-27, respondent was not required to make a correlative adjustment. Therefore, FAB's income will remain unadjusted, and accordingly its earnings and profits remain the same. In sum petitioners have not shown that FAB lacks sufficient earnings and profits to pay a taxable dividend. See sec. 301. The Berrittos chose the corporate form for FAB, and therefore they must abide by the results of that choice. Accordingly, we sustain respondent's determination regarding the constructive dividends with the exception of the director's fees as explained below.

While we agree with respondent on the characterization of some of the constructive dividends, petitioners have demonstrated that no economic benefit was conferred upon the Berrittos by FAB's deduction of the director's fees for the 2012 and 2013 tax years, respectively. Once a petition is filed with this Court, our jurisdiction extends to the entire subject matter of the correct tax for the taxable year. Naftel v. Commissioner, 85 T.C. 527, 533 (1985). Consequently, we will review the director's fees.

[*32] The Berrittos included the director's fees in their income for tax years 2012 and 2013. While the Berrittos did receive an economic benefit from such payments, they already paid tax on this benefit because it was included as income on their individual returns. Assuming, arguendo, that we were to conclude that the director's fees are a constructive dividend, the Berrittos would be required to pay tax on the same income twice: once as director's fees and once as constructive dividends. Accordingly, to the extent that the constructive dividend determinations for 2012 and 2013 relate to the director's fees, the Berrittos have demonstrated that respondent's determination is erroneous.

## IV. Conclusion

In conclusion, we hold that (1) the assessment limitations periods had not expired before the SNODs were mailed to Mr. Berritto for tax years 2010 through 2012 and to FAB for the tax years ending March 31, 2011 through 2014, (2) the IRS is not required to make a correlative adjustment to FAB's income, and (3) the Berrittos failed to show that they did not receive constructive dividends, except to the extent of the director's fees for 2012 and 2013. In reaching our holdings, we have considered all arguments made, and to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

**[*33]** To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.